UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
ORLANDO DIVISION

**ELIZABETH JAYNEA HARRISON,**

    **Plaintiff,**

v.                Case No. 6:16-CV-954-ORL-41KRS

**COMMISSIONER OF SOCIAL
SECURITY,**

    **Defendant.**

_____

**REPORT AND RECOMMENDATION**

**TO THE UNITED STATES DISTRICT COURT:**

  This cause came on for consideration without oral argument on the Complaint filed by Plaintiff, Elizabeth Jaynea Harrison, seeking review of the final decision of the Commissioner of Social Security denying her claim for social security benefits, Doc. No. 1, the answer and certified copy of the record before the Social Security Administration ("SSA"), Doc. Nos. 12, 14, and the parties' Joint Memorandum, Doc. No. 18.[1]

**PROCEDURAL HISTORY.**

  In 2012, Harrison filed applications for benefits under the Federal Old Age, Survivors and Disability Insurance Programs ("OASDI"), 42 U.S.C. § 401, *et seq.*, and under the Supplemental

---

[1] In the Scheduling Order, I required counsel for the parties to submit a single, Joint Memorandum with an agreed statement of the pertinent facts in the record. Doc. No. 15. Counsel for Plaintiff was ordered to identify and frame, in a neutral fashion, each of the disputed issues raised as grounds for reversal and/or remand, and counsel for the Commissioner was required to respond to each of those issues in the format set forth in the Scheduling Order. *Id.* at 4.

Security Income for the Aged, Blind and Disabled Program ("SSI"), 42 U.S.C. § 1381, *et seq*. (sometimes referred to herein as the "Act"). She alleged that she became disabled on June 5, 2011. R. 215, 221.

After her applications were denied originally and on reconsideration, Harrison asked for a hearing before an Administrative Law Judge ("ALJ"). R. 171-72. An ALJ held a hearing on July 15, 2014. Harrison, accompanied by an attorney, and a vocational expert ("VE") testified at the hearing. R. 40-66.

After considering the hearing testimony and the evidence in the record, the ALJ issued a decision. R. 18-32. The ALJ found that Harrison was insured under OASDI through December 31, 2013. The ALJ concluded that Harrison had not engaged in substantial gainful activity since the alleged disability onset date. R. 20.

The ALJ found that Harrison had the following severe impairments: lumbar spine joint disease; osteoarthritis of the shoulder; and limited vision in the left eye with status post cataract surgery in the right eye. *Id.* The ALJ concluded that Harrison did not have an impairment or combination of impairments that met or equaled an impairment listed in SSA regulations. R. 23.

The ALJ concluded that Harrison had the residual functional capacity ("RFC") to perform light work, except as follows:

> [S]he cannot climb ropes, ladders or scaffolds. The claimant can frequently climb ramps and stairs and can occasionally bend, balance, stoop, squat, crouch, crawl and kneel. She cannot perform overhead lifting but can otherwise use her upper extremities in all ways. The claimant can see but does not have peripheral vision in her left eye. She should not work around heights or vibrations.

R. 23.  In making this finding, the ALJ credited the opinion of Alyn Benezette, D.O., a board-certified neurologist[2], regarding Harrison's functional capacity as of October 2011[3], but he gave little weight to Dr. Benezette's functional capacity assessment rendered in January 2013.  R. 29.  The ALJ gave significant weight to the opinion of James Gibson, D.O., a reviewing physician.  *Id.*  The ALJ determined that Harrison's statements about her functional limitations were not entirely credible.  *Id.*

The ALJ determined that Harrison could not perform her past relevant work as a Painter Instructor and Pressure Washer/Steam Cleaner.  R. 30.  Based on the testimony of the VE, the ALJ concluded that there were light, unskilled jobs available in the national economy that Harrison could perform.  R. 31.  Therefore, the ALJ concluded that Harrison was not disabled.  *Id.*

Harrison requested review of the ALJ's decision by the Appeals Council.  R. 12.  On April 6, 2016, the Appeals Council found no reason to review the ALJ's decision.  R. 1-3.

Harrison now seeks review of the final decision of the Commissioner by this Court.

## JURISDICTION AND STANDARD OF REVIEW.

Harrison having exhausted her administrative remedies, the Court has jurisdiction to review the decision of the Commissioner pursuant to 42 U.S.C. § 405(g), as adopted by reference in 42 U.S.C. § 1383(c)(3).  A court's review of a final decision by the SSA is limited to determining whether the ALJ's factual findings are supported by substantial evidence, *Dyer v.*

---

[2] Coastal Pain & Neurology Centers, http://www.coastalpaincenter.com/doctors (last visited June 12, 2017).
3 The ALJ wrote as follows:  "For example, when [Dr. Benezette] found [Harrison] reached maximum medical improvement he said that she could perform light work with no repetitive reaching, pushing, pulling, heavy lifting or carrying particularly with the right upper extremity, which *is* consistent with his own treatment notes . . . ."  R. 29.

*Barnhart*, 395 F.3d 1206, 1210 (11th Cir. 2005) (per curiam), and whether the ALJ applied the correct legal standards, *Lamb v. Bowen*, 847 F.2d 698, 701 (11th Cir. 1988).

## SUMMARY OF THE FACTS.

After a thorough review of the record, I find that the facts are generally adequately stated in the Joint Memorandum and the ALJ's decision, which statement of facts I incorporate by reference. Accordingly, I will only summarize facts pertinent to the issues raised to protect Harrison's privacy to the extent possible.

Harrison was born in 1964. R. 215. She obtained a GED in 1984. R. 51. She previously worked as a painter and pressure washer. *Id.*

Harrison was involved in a motor vehicle accident on June 2, 2011. R. 329, 395. At the ALJ's hearing, Harrison testified that she suffered from migraine headaches. R. 53-54. She had constant pain in her neck and lower back. R. 59-60. She also had cataract surgery on her right eye, after which her vision improved. She had no vision in her left eye. R. 54. She reported that she sometimes lost control of her right hand and dropped objects. R. 55. She could pick items up with her left hand. During a typical day she alternated sitting and walking because it was difficult for her to sit. R. 56, 58. She also had difficulty walking because her legs would become numb. R. 56. She estimated that she could walk half a block. R. 57. She could lift about seven pounds, but she experienced pain with that activity. R. 58. She tried to swim every day. R. 56. In a written function report dated May 25, 2012, Harrison indicated that she performed light house work, watered her garden (but did not weed or plant), cared for her pets and prepared frozen food and cereal. She also shopped for groceries once every two weeks. She could use a computer. R. 264-67. She drove only when absolutely necessary. R. 273.

She had bad days two to three times a week due to migraines. R. 59. Migraine headaches lasted up to two hours at a time. R. 61. She had difficulty focusing, and medication caused grogginess/drowsiness. R. 61, 272, 283.

Medical records show that Albert W. Gillespy, M.D., a board-certified orthopaedic surgeon[4], began treating Harrison on June 29, 2011. Upon examination, Dr. Gillespy observed spasm and tenderness in the cervical and mid thoracic spine, mild spasm and tenderness in the lumbar spine, and a positive impingement sign in the shoulders. A straight-leg raising test was positive bilaterally. R. 342. X-rays of the cervical spine showed C3-4 and C5-6 mild degenerative disc disease ("DDD") and osteoarthritis. X-rays of the thoracic spine showed mild thoracic/lumbar spine scoliosis with mild DDD and osteoarthritis. X-rays of the lumbar spine showed L4-5 mild DDD and osteoarthritis. X-rays of the shoulder showed mild osteoarthritis involving the AC joint on the right and the left. R. 343. Dr. Gillespy's impressions were acute cervical/thoracic/lumbar strain syndrome; cervical/thoracic/lumbar spine DDD and osteoarthritis; and, bilateral shoulder bursitis/tendinitis. He recommended physical therapy, and he encouraged Harrison to increase her physical activities as much as possible. *Id.*

Sean M. Mahan, M.D., a board-certified radiologist, opined that an MRI of the lumbar spine taken in August 2011 revealed a disc bulge at L3-4 and broad-based herniations at L4-5 and L5-S1 with narrowing of the spinal canal. R. 330-31. He opined that a cervical MRI showed posterior herniation of the disc at C3-4 and C4-5, the latter causing spinal cord compression. R. 403-04. He also identified a herniating disc at C5-6 with spinal cord compression and marked stenosis that might be impinging the C6 nerve root. R. 405.

---

[4] Orthopaedic Clinic of Daytona Beach, https://www.orthodb.com/albertwgillespy.asp (last visited June 12, 2017).

Harrison returned to Dr. Gillespy's practice on August 8, 2011, after six sessions of physical therapy. She complained of neck and back pain and weakness in her right arm, particularly in grip strength. R. 348. Examination by Brooke Wivholm, P.A.-C, revealed spasm and tenderness in the cervical, mid thoracic and lower lumbar spine, positive impingement signs in the shoulders and a positive straight-leg raising test bilaterally. R. 348.

On September 7, 2011, Dr. Gillespy again examined Harrison. Harrison stated that physical therapy was not helpful. Dr. Gillespy noted that the physical therapist reported symptom magnification. Harrison told the therapist that her attorney was seeking a second opinion. Upon examination, Dr. Gillespy noted nondescript tenderness involving the low lumbar spine area and that a straight-leg raising test was positive for pain bilaterally. Dr. Gillespy opined that Harrison had reached maximum medical improvement ("MMI") and discharged her from his care. R. 339. In a questionnaire completed on May 31, 2012, Dr. Gillespy stated that Harrison had 5/5 muscle strength in her legs. R. 370.

Dr. Benezette examined Harrison on October 7, 2011 on referral from Dr. Gillespy. She complained of constant, radiating headaches originating in the cervical spine. She also reported neck and shoulder discomfort radiating to the right arm with impairment of strength, sensation and fine dexterity, including dropping things. She also reported radiating low back pain affecting her ability to sit, stand, walk, stoop, squat, or bend. Her pain was 10 on a 10-point pain scale. R. 500. Upon examination, Dr. Benezette observed moderate restriction of motion with spasm and tenderness in the lower cervical and upper thoracic spine. R. 501. Myofascial trigger points were palpable in the shoulder muscles. The lumbosacral spine had mild to moderate restriction in range of motion with moderate spasms and tenderness, left greater than right. A straight-leg

raising test was positive in the right leg, and he noted a positive Patrick's sign for sacroiliac disease in both legs localizing to the left sacroiliac joint region. Muscle strength was 5-/5 in grip in the right hand and in the right leg, with 5/5 muscle strength otherwise in the upper and lower extremities. Sensation was decreased in the legs, and Harrison's gait was antalgic. Dr. Benezette's impressions were cervical/lumbar disc disorder/radiculopathy/ spondylosis/myofascitis/sprain/strain with secondary headaches; thoracic myofascitis/sprain/ strain/spasm; and, disequilibrium. R. 502. Dr. Benezette prescribed medication and ordered further testing. R. 502-03.

Upon examination on October 26, 2011, Dr. Benezette observed moderate restriction in motion of the cervical spine with spasm and tenderness in the cervical and upper thoracic spine. Myofascial trigger points were palpable in the shoulder muscles. The lumbosacral spine showed mild to moderate restriction of motion with moderate spasm and tenderness, particularly in the left sacroiliac joint region. Dr. Benezette noted mild atrophy in the gastrocnemius (calf) muscle in the right leg. R. 409. Strength testing was 5-/5 in the right hand and 5/5 otherwise in the upper extremities. Strength testing was 5-/5 in the right leg and otherwise 5/5 in the lower extremities. Dr. Benezette noted decreased pinprick sensation in the right upper and lower extremities. Harrison's gait was antalgic. R. 409. His impressions remained the same. He opined that Harrison had reached MMI with a 6% permanent impairment rating. He restricted Harrison to light activities and indicated that she should refrain from repetitive reaching, pushing, pulling, heavy lifting or carrying, particularly with the right arm. R. 410. He administered a bilateral thoracic myofascial trigger point injection. R. 495.

7

Harrison was treated at Tomoka Eye Associates for vision problems. On April 30, 2012, Alan D. Spertus, M.D., performed cataract surgery on Harrison's right eye. R. 357. Thereafter, her vision was 20/20 without correction in the right eye. R. 414. She had limited vision in the left eye. R. 572. A treatment provider whose signature is illegible opined that Harrison had limited vision and visual field in the left eye. R. 584.

Dr. Benezette examined Harrison again on May 30, 2012. Harrison reported headache and neck and low back pain predominantly right sided. She indicated that migraine headaches were well controlled with medication. She used Aleve for neck and back pain, but her pain levels were still 7 on a 10-point pain scale. She was doing short distance walking and home pool therapy. R. 488. Upon examination, Dr. Benezette observed moderate restriction in motion with spasm and tenderness in the lower cervical and upper thoracic spine. He observed mild to moderate restriction in motion with moderate spasm and tenderness in the lumbosacral spine, with particular tenderness in the left sacroiliac joint region. Grip strength was 5-/5 in the right hand and right leg and otherwise 5/5 in the upper and lower extremities. Harrison had decreased sensation in the right leg and arm. She had an antalgic gait. R. 489. Dr. Benezette prescribed medication. R. 490.

Dr. Benezette prepared a neurological questionnaire on June 18, 2012. He reported his assessments of Harrison's conditions, and indicated that she had the following symptoms arising from her neurological impairment: decreased grip strength; decreased ability to perform fine manipulation; gait disturbance; motor loss; and atrophy. He supported these findings with 5-/5 grip strength in the right hand grip and right leg, an antalgic gait and mild atrophy of the right gastrocnemius muscle. R. 559.

Dr. Benezette examined Harrison on July 3, 2012. He observed multiple areas of trigger and tender points in the neck and upper and lower back. Range of motion in the neck and upper back were limited. R. 580. He observed that EMG and nerve conduction studies demonstrated right S1, right C5-6 and right C8-T1 radiculopathy. R. 581; *see also* R. 411-12. Sanjay S. Sastry, M.D., administered trigger point injections in the neck and upper back. R. 378-80.

On July 11, 2012, Harrison reported that these injections did not give her any improvement. Upon examination, Dr. Sastry noted multiple trigger and tender points in the neck and upper and lower back with limited range of motion. R. 375. Dr. Sastry opined that Harrison had cervical myofascial pain syndrome with cervical radiculopathy and lumbar myofascial pain syndrome with lumbar radiculopathy. R. 376.

On September 8, 2012, Dr. Gibson prepared a functional capacity assessment after review of Harrison's records. Dr. Gibson opined that Harrison could lift up to 20 pounds occasionally and 10 pounds frequently. She could stand and/or walk and sit about 6 hours in an 8-hour workday. She would need to alternate sitting and standing to relieve pain and discomfort. She would be limited to frequent pushing and pulling with the right upper extremity, and she had a limited ability to reach on the right, including overhead. She could never climb ladders/ropes/ scaffolds and only occasionally climb ramps/stairs, balance, stoop, kneel, crouch or crawl. She had limited field of vision and depth perception with the left eye. She should avoid concentrated exposure to extreme cold, humidity and vibrations and avoid even moderate exposure to hazards. R. 130-34. In sum, Dr. Gibson wrote as follows:

> Claimant is partially credible. She does have significant limitations which would reduce her RFC. That said, she is able to walk without [assistance], drive a car, shop, cook and do light household tasks. She is capable of sustaining light work.

9

>She might need help in re-training but she is not totally and perm[a]nently disabled from all work.

R. 133-34.

On October 2, 2012, Harrison reported that she continued to have recurrent debilitating headaches with neck and low back pain. She also reported that she had impaired grip and dexterity in her right arm. R. 373. Upon examination, the treatment provider[5] observed moderate restriction in range of motion in the cervical spine with spasm and tenderness. The treatment provider also observed mild to moderate restriction in range of motion in the lumbosacral spine with moderate spasm and tenderness with particular tenderness in the left sacroiliac joint region. Harrison's left pupil was not reactive to light. Strength testing was 5-/5 in the right hand and 5-/5 in the lower extremities. R. 374.

On January 29, 2013, Dr. Benezette prepared a functional capacity assessment form. He wrote that Harrison had cervical/lumbar disc disorder with radiculopathy/spondylosis, thoracic myofacsitis and headaches. Her prognosis was guarded. Harrison had constant, moderate to severe paravertebral muscle spasms with tenderness, weakness and sensory impairment in her upper and lower extremities. He opined that Harrison's symptoms would constantly interfere with the attention and concentration needed to perform even simple work tasks. He indicated that she could walk 2 city blocks. She could sit or stand/walk 30 minutes at a time for a total of 2 hours of each activity during a day. She would need to walk around every 30 minutes for 5 minutes at a time. She would need a job that permitted a sit/stand option at will. She would require unscheduled breaks every 2 to 3 hours for 15 to 30 minutes each. She could occasionally

---

[5] The treatment note is signed by Sanjay Sastry, M.D., for Dr. Benezette. Dr. Benezette also signed the treatment note. R. 376.

lift less than 10 pounds and rarely lift up to 20 pounds. She could rarely look down, turn her head right or left, look up or hold her head in a static position. She could occasionally twist, rarely stoop or crouch and never climb ladders or stairs. She would have significant limitations with reaching, handling or fingering. She could use her right hand 5% of the time to grasp, turn and twist objects and her use fingers 5% of the time for fine manipulation. She could reach overhead on the right 10% of the time. She could use her left hand 50% of the time to grasp, turn and twist objects and 100% of the time for fine manipulation. She could use her left arm 25% of the time to reach, including overhead. She would have good and bad days, and she would likely be absent from work more than 4 days per month as a result of her impairments and treatment. R. 382-85.

Dr. Benezette examined Harrison again on March 31, 2014. She complained of constant neck and low back pain radiating into her arms and legs, greater on the right. She reported sensory impairment in her right arm to her fingertips. She frequently dropped things due to loss of dexterity and grip in the right hand. Due to radiating low back pain, she had difficulty standing, walking and lifting and carrying objects that weighed more than 5 pounds. She took Aleve to treat flare-ups in back pain. She also had migraine headaches. R. 459. Upon examination, Dr. Benezette observed moderate restriction in motion, moderate spasm and tenderness in the cervical and upper thoracic spine. He observed mild-moderate restriction in motion, moderate spasm and tenderness in the lumbosacral spine. R. 460. Strength testing was 5-/5 in the right hand and 5/5 otherwise in the upper extremities. Strength testing was 5-/5 in the right leg and 5/5 otherwise in the legs. Her gait was antalgic. His assessments were cervical/lumbar disc disorder/radiculopathy/spondylosis/

myofascitis/sprain/strain; thoracic myofascitis/sprain/strain/spasm; and headaches secondary to the cervical impairment. He restricted Harrison to sedentary-light activities with no lifting and carrying more than 5 pounds. She should be allowed to change positions frequently. R. 460.

Dr. Benezette examined Harrison again on June 30, 2014. Her complaints were largely the same as previously with the additional report that her right leg would be completely numb and she fell once when the leg gave out under her. R. 467. Upon examination, he found 5/5 muscle strength in the upper and lower extremities. She had decreased pin prick sensation in the right extremities. Her gait was normal and her station was normal when standing. R. 469. He observed moderate cervical and upper thoracic spasms, mild thoracic spasms, and moderate lumbar spasms without lumbar tenderness. Cervical spine range of motion was moderately restricted and thoracic and lumbar spine range of motion were mildly to moderately restricted. His assessments were cervical disc disorder; myalgia and myositis, unspecified; and, cervical and lumbar radiculopathy. Harrison's functional restrictions remained the same. R. 470.

Dennis M. Murphy, M.D., a board-certified neurosurgeon[6], examined Harrison on May 9, 2014, on referral from Dr. Benezette. Harrison complained of headache, neck pain and right arm pain and numbness. R. 438. Dr. Murphy reviewed a cervical MRI which he noted was out of date. After examining Harrison, Dr. Murphy opined that she had whiplash injuries that typically would improve over time. R. 439.

An X-ray of the cervical spine taken on May 16, 2014 showed disc degeneration at C3-4, C4-5 and C5-6 with spondolytic spurs at C3-4 and C5-6. R. 418. An MRI of the cervical spine

---

[6] Florida Hospital, Dennis Mark Murphy, M.D., https://www.floridahospital.com/doctor/dennis-mark-murphy-md-1992704522 (last visited June 9, 2017).

revealed posterior lateral/neural foraminal disc protrusion at C3-4 exerting mass effect on the exiting left C4 nerve roots contributing to severe left neural foraminal stenosis, among other findings. R. 419. Dr. Murphy opined that these studies did not show a single level of advanced disc space narrowing as might cause cervicalgia. R. 425.

Dr. Murphy continued to treat Harrison for complaints of neck and back pain among other issues. The diagnoses were pain, cervicalgia; cervical spondylosis without myelopathy; degeneration of cervical intervertebral disc; and, migraine. *See, e.g.,* R. 428-30, 435-36. On July 15, 2014, Dr. Murphy's examination was largely normal. Dr. Murphy wrote that Harrison did not require surgery on the cervical spine. R. 477.

At the ALJ's hearing, the ALJ asked the VE to assume a hypothetical person with the limitations reported by Dr. Benezette in his 2013 functional capacity assessment. The VE testified that this hypothetical person could not sustain competitive employment. R. 63. The VE then asked whether an individual with the limitations in the ALJ's RFC assessment could perform any work available in the national economy. R. 63-64. The VE identified three unskilled, light exertional jobs available in the national economy that this hypothetical person could perform. R. 64.

## ANALYSIS.

In the Joint Memorandum, which I have reviewed, counsel for Harrison raises two interrelated assignments of error. In the first assignment of error, counsel argues that the ALJ erred by giving little weight to the January 2013 functional capacity assessment prepared by Dr. Benezette, a treating physician. In this assignment of error, counsel also asserts that the ALJ erred by failing to state the weight given to the opinions of Dr. Gillespy and treatment providers

13

at Tomoka Eye Associates. In the second assignment of error, counsel for Harrison argues that due to the errors identified in the first assignment of error, the ALJ's hypothetical question to the VE was incomplete. Counsel for Harrison asks that the final decision of the Commissioner be reversed and that the case be remanded for further proceedings. These are the only issues I will address.

*Weight Given to Opinions of Treating and Reviewing Physicians*.

"The law of this circuit is clear that the testimony of a treating physician must be given substantial or considerable weight unless 'good cause' is shown to the contrary." *Lewis v. Callahan*, 125 F.3d 1436, 1440 (11th Cir. 1997). Good cause exists when the doctor's opinion is not supported by evidence, is conclusory or is inconsistent with the doctor's own medical records. *Id.*

### Dr. Benezette.

Dr. Benezette was a treating physician. He is also a board certified neurologist and, therefore, his opinions in his area of specialty are entitled to more weight than opinions of physicians who are not specialists. 20 C.F.R. §§ 404.1527(c)(5), 416.927(c)(5). Nevertheless, the ALJ gave little weight to Dr. Benezette's January 2013 functional capacity assessment, finding it inconsistent with Dr. Benezette's treatment notes. R. 29. Specifically, the ALJ found that Dr. Benezette's January 2013 opinion was unreliable because, in his most recent evaluation, Dr. Benezette found that Harrison had 5/5 grip strength and muscle strength. *Id.* While this statement is correct, it ignores the bulk of the evidence in the record during the entire alleged disability period.

The Court must consider the entire record and take account of the evidence in the record that detracts from the evidence relied on by the ALJ. *Foote v. Chater*, 67 F.3d 1553, 1561 (11th Cir. 1995)(quoting *Parker v. Bowen*, 793 F.2d 1177 (11th Cir. 1986)). As discussed in the Statement of Facts above, from October 7, 2011 through March 31, 2014, Dr. Benezette consistently found that Harrison had restricted range of motion with spasm and tenderness throughout her spine. Her gait was antalgic. Muscle strength in her right hand and right leg were 5-/5. She had atrophy in the right calf. Dr. Benezette identified these findings in his neurological questionnaire dated June 18, 2012 as evidence of decreased grip strength; decreased ability to perform fine manipulation; gait disturbance; motor loss; and, atrophy. Therefore, a finding of 5/5 strength in June 2014 is not evidence that undermines Dr. Benezette's assessment of Harrison's functional limitations as of January 2013.

The ALJ also found that Dr. Benezette said in October 2011 that Harrison could perform "light work," R. 29, but Dr. Benezette's actual finding was that Harrison could perform "light activities." Considering the record as a whole, it is not evident that Dr. Benezette equated "light activities" with the SSA's definition of light work, which is defined as work that involves lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds. Light work also requires a good deal of walking or standing, or when it involves sitting most of the time, there may be some pushing and pulling of arm and leg controls. 20 C.F.R. § 404.1567(b).

The ALJ also stated as support for his treatment of Dr. Benezette's 2013 functional capacity assessment that Harrison had seen Dr. Benezette only every three months with a long

15

gap in treatment before the ALJ's hearing. Dr. Benezette was a specialist rather than a primary care physician and, thus, that he examined Harrison periodically is not remarkable.[7]

Additionally, the ALJ relied on Dr. Murphy's examination of Harrison on July 15, 2014, which was essentially normal. This examination was performed more than a year after Dr. Benezette prepared his 2013 functional capacity assessment. The improvement noted by Dr. Murphy may be evidence that Harrison's condition improved, but it does not undermine Dr. Benezette's opinion regarding Harrison's functional limitations in January 2013.

For these reasons, I recommend that the Court find that the ALJ did not state good cause for giving little weight to Dr. Benezette's 2013 functional capacity assessment.

<u>Other Treating Physicians</u>.

Counsel for Harrison also asserts that the ALJ erred by failing to state the weight he gave to opinions of other treating physicians, particularly Dr. Gillespy and treatment providers at Tomoka Eye Associates. An ALJ's failure to indicate with particularity the weight afforded a treating physician's opinion is reversible error. *Sharfarz v. Bowen*, 825 F.2d 278, 279 (11th Cir. 1987)(per curiam). Such error may be deemed harmless, however, when a correct statement of the weight given to the physician's opinion would not contradict the ALJ's ultimate determination. *Caldwell v. Barnhart*, 261 F. App'x 188, 190 (11th Cir. 2008) (citing *Diorio v. Heckler*, 721 F.2d 726, 728 (11th Cir. 1983)) (cited as persuasive authority).

---

[7] Counsel for Harrison also submits that the ALJ's finding based on only periodic treatment by Dr. Benezette is disingenuous because the ALJ gave great weight to the opinion of Dr. Gibson, who never examined Harrison. This argument is not persuasive. At the time the ALJ issued his decision, he was allowed to consider the opinions of reviewing physicians as the opinions of experts in Social Security disability evaluations. *See, e.g., Gill v. Colvin*, No. CV-13-S-415-NE, 2013 WL 6191581, at *3 (N.D. Ala. Nov. 26, 2013)(and authority cited therein).

I recommend that the Court find that the failure to state the weight given to opinions of treating professionals at Tomoka Eye Associates was harmless. The ALJ included Harrison's vision limitation in her left eye in the RFC assessment. After cataract surgery, Harrison's vision was normal in her right eye. Therefore, Harrison has not shown that giving weight to the opinions of treating professionals at Tomoka Eye Associates would contradict the ALJ's RFC assessment.

The record does not establish, however, that the failure to state the weight given to the opinions of Dr. Gillespy was harmless. Dr. Gillespy's impressions that Harrison had acute cervical/thoracic/lumbar strain syndrome, DDD and osteoarthritis and bilateral shoulder bursitis/tendinitis support Dr. Benezette's later findings. Examination in Dr. Gillespy's office after Harrison had six sessions of physical therapy revealed spasm and tenderness in the cervical, mid thoracic and lower lumbar spine, positive impingement signs in the shoulders and a positive straight-leg raising test bilaterally, which is objective evidence supporting her complaints of pain. Dr. Benezette made similar findings in his examinations of Harrison. Thus, Dr. Gillespy's opinions, if properly weighed by the ALJ, support Dr. Benezette's findings and show that Dr. Benezette's opinions are not wholly unreliable.

For these reasons, I recommend that the Court find that the failure to state the weight given to the opinions of Dr. Gillespy was reversible error.

*Hypothetical Question to the VE.*

In order for the testimony of a VE to constitute substantial evidence, the ALJ must pose a hypothetical question that comprises all of the claimant's impairments. *Jones v. Apfel*, 190 F.3d 1224, 1229 (11th Cir. 1999). When, as in this case, the ALJ has not properly assessed the claimant's RFC due to failure to properly weigh the opinions of treating physicians, the record is insufficient to determine whether the hypothetical questions to the VE included all of Harrison's impairments. Therefore, I recommend that the Court find that Harrison's second assignment of error is well taken.

## RECOMMENDATION.

For the reasons stated above, I **RESPECTFULLY RECOMMEND** that the final decision of the Commissioner be **REVERSED** pursuant to sentence four of § 405(g) and that the case be **REMANDED** for further proceedings. I further **RECOMMEND** that the Court direct the Clerk of Court to issue a judgment consistent with its decision on this Report and Recommendation and, thereafter, to close the file.

## Notice.

Failure to file written objections to the proposed findings and recommendations contained in this Report and Recommendation within fourteen (14) days from the date of its filing shall bar an aggrieved party from challenging on appeal the district court's order based on unobjected-to factual and legal conclusions.

Respectfully recommended this 13th day of June 2017.

*Karla R. Spaulding*
KARLA R. SPAULDING
UNITED STATES MAGISTRATE JUDGE